FILED

APR 2 3 2014

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| RANDALL J. MEIDINGER, | * | CIV. 12-5064-JLV |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | REPORT AND RECOMMENDATION |
| CITY OF RAPID CITY; and | * | RE: SUMMARY JUDGMENT MOTION |
| PETER RAGNONE; | * | (DOC. 38) AND |
| STEVE ALLENDER; | * | MOTION TO DISMISS (DOC. 44) |
| JOHN LEAHY, and | * | |
| SAM KOOIKER, in their individual | * | |
| capacities. | * | |
| | * | |
| Defendants. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Pending are defendants' joint motion for summary judgment (Doc. 38), Kooiker's motion

for leave to file an amended answer (Doc. 42), and Kooiker's motion to dismiss for failure to state

a claim (Doc. 44).

**I.**
**PLEADINGS FILED BY THE PARTIES**

In support of the motion for summary judgment defendants filed their Statement of Material

Facts (Doc. 39); Memorandum (Doc. 40); and Affidavit in Support of their Motion for Summary

Judgment with attached Exhibits A-G (Doc. 41).

In opposition to the summary judgment motion plaintiff filed his Response to Motion for

Summary Judgment (Doc. 56); Memorandum in Opposition (Doc. 57); Statement of Material Facts

(Doc. 58); Affidavit of Angela M. Colbath (Doc. 59) with attached Exhibits 1-48 (Docs. 59-77).

In support of Kooiker's motion to dismiss (Doc. 44) he filed a Motion for Leave to File an Amended Answer (Doc. 42);  Memorandum in Support of the motion to amend (Doc. 43); and a Memorandum in Support of the motion to dismiss (Doc. 45).

In opposition to the motion to dismiss plaintiff filed Response (Doc. 54) and Memorandum (Doc. 55).  Defendants also filed reply briefs (Doc. 79 re: the motion for summary judgment and Doc. 80 re: the motion to dismiss).

Based on a careful consideration of all the evidence and counsel's written submissions the Court respectfully makes the following:

## II.
## RECOMMENDATION

It is respectfully recommended that the Motions for Summary Judgment by Rapid City, Sam Kooiker, John Leahy, and Steve Allender be GRANTED.  It is respectfully recommended that the motion by Peter Ragnone addressing the Fourteenth Amendment be GRANTED and addressing the Fourth Amendment be DENIED.

It is respectfully recommended that Sam Kooiker's Motion to Dismiss For Failure To State a Cause of Action (legislative immunity) should be DENIED. Sam Kooiker's motion to amend his answer is being contemporaneously DENIED in a separate Order.

## III.
## JURISDICTION

Plaintiff Randy Meidinger sued the defendants under 42 U.S.C. § 1983 alleging defendants deprived him of certain constitutional rights under color of law.  The pending motions were referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A), Judge Schreier's Standing Order dated March 18, 2010 and Judge Viken's Amended Order of Referral (Doc. 49).

## IV.
## FACTUAL BACKGROUND

Disputed facts are viewed in the light most favorable to Meidinger.[1] Randy Meidinger was employed at the Rapid City Landfill. Peter Ragnone is employed with the Rapid City Police Department. Steve Allender is the Chief of Police for the Rapid City Police Department. John Leahy was formerly employed at the Rapid City Landfill. Sam Kooiker was an alderman on the city council from 2002 until he was elected Mayor of Rapid City in 2011.

In the spring of 2009 city alderman Sam Kooiker was told by owners of a private landfill that Fish Garbage Service was probably cheating the city by dumping material at the Rapid City landfill at reduced rates or for free by declaring the material as alternative cover when it was not alternative cover. Generally Concover is used five days per week and dirt is used one day per week to cover waste dumped at the landfill. Alternative cover is material the city could also use to cover waste. Because the city can use alternative cover at the landfill for the same purpose as cover the city must buy, alternative cover is accepted at reduced rates or for free to save the money the city would otherwise spend to buy cover. Sawdust is one type of alternative cover, but not the only type of alternative cover. Alternative cover is also soil saturated with hydrocarbons, street sweepings, ground-asphalt, dirt and mud. John Leahy told Ragnone in his memo that in addition to Concover, "[o]ther items such as sawdust/glue from Merilatt, soil contaminated with heavy hydrocarbons, street sweepings, etc. are used as cover intermittently during daily operations."

---

[1]*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir.2011).

3

In April, 2009, Warren Ghere contacted Kooiker to tell him that loads coming into the landfill were not being properly weighed or were not being properly described at the landfill scale. Warren and DeeDee Ghere identified Meidinger as the inside man. Kooiker in turn told Detective Ragnone that Meidinger was in collusion with Fish Garbage Service. Meidinger was accused of allowing Fish Garbage Service trucks to declare that sawdust was being carried when sawdust was not being carried on the truck.

On May 2, 2009, Kooiker sent an email to Robert Ellis, P.E., Public Works Director, saying a hauler dumped several loads in early April classified as "shingles/asphalt" and paid the $20 per ton rate instead of $54. ". . . . This hauler may have been getting deals like this for awhile from an inside connection at the landfill."[2]

On May 5, 2009, Public Works Director Ellis replied to Kooiker "we spent a great deal of time yesterday investigating this matter and I am confident in saying there exists no collusion to defraud the City Landfill between either Fish Garbage Service or our landfill attendants." Randy Meidinger was asked directly if he was or is "on the take" with Fish Garbage Service. Meidinger said "no." Ellis, Jerry Wright and John Leahy have "no reason to believe that Randy is a dishonest person" and he "has been a very good employee and has a positive track record with the Solid Waste Division."[3]

Kooiker pressed for an investigation by law enforcement. The investigation was assigned to police officer Peter Ragnone. Kooiker was no longer involved in the investigation after law enforcement began its investigation. But Kooiker later ran for mayor of Rapid City and made the

---

[2]Doc. 59-4, p. 2 of 5.

[3]Doc. 59-4, p. 1 of 5.

landfill issue the centerpiece of his campaign. He aggressively criticized his opponent and his opponent's handling of the landfill issue. Kooiker won the election.

In August, 2009, Ragnone began to investigate allegations that Fish drivers were defrauding the city through means of deception or collusion with a city employee, Randall Meidinger, who operated the scalehouse at the landfill. Meidinger was like a gatekeeper. Ragnone first talked to a former scalehouse employee, Darrel Bishop. Bishop caught Fish drivers declaring material as alternative cover when it was not. Ragnone also interviewed Fish Garbage employee Don Anderson who was treated as a confidential informant.[4]

On September 11, 2009, Ragnone interviewed Meidinger. Meidinger acknowledged drivers of Fish Garbage Service trucks identified material as alternate cover when it was not. Meidinger acknowledged receiving a total of $200 (fifty or one hundred dollars on different occasions a few years before 2009) from the owners of Fish at Christmas time. He also acknowledged being invited by Fish to a Christmas party in Deadwood. Meidinger explained that if a driver declared a load to be alternative cover, he accepted their word for it. There was no city policy at that time which required Meidinger to visually inspect a load to verify the material was what the driver declared it to be. Ragnone testified to a grand jury that Dave Holtz was in the habit of inspecting loads, but Darrel Bishop was not. Ragnone provided information to the State's expert witness which she used to prepare an exhibit to illustrate the misidentified loads which came across the scale. The exhibit erroneously attributed to Meidinger misidentified loads coming across the scale when he was not working. The exhibit also attributed to Meidinger misidentified loads which came across the scale when he was working. Meidinger acknowledged cutting breaks to Fish drivers, but persistently

---

[4]Doc. 66, Ex. 16.

denied *knowingly* cutting breaks to Fish drivers. Meidinger was interrogated on a Friday. On the following Monday he was fired. Meidinger was indicted by three different grand juries. Meidinger's case was tried to a jury in May of 2011. He was acquitted.

On March 4, 2010 and on March 31, 2011, Ragnone testified to two separate grand juries. Ragnone told the first grand jury alternative cover is exclusively sawdust. "It's the same stuff that you would sweep off your garage floor if you cut a board or was building a deck. It's just that, it's sawdust."[5]  On both occasions he testified that Meidinger confessed to knowingly cutting breaks to Fish in exchange for money. On July 22, 2010, there was also a grand jury which considered charges against Meidinger. Ragnone did not testify to the July, 2010, grand jury. Captain Cady did. Cady is not a defendant in this case.

Merillat is the only producer of sawdust who needs a commercial garbage hauler to haul its sawdust to the landfill. Fish is the only commercial garbage hauler who hauls for Merillat. Ragnone testified to the grand jury that only sawdust is alternative cover and that only Fish Garbage Service possessed a contract to haul sawdust to the Landfill. If sawdust were the only alternative cover and if Fish Garbage were the only contract hauler for sawdust, then only Fish Garbage Service could be hauling alternative cover and only Fish could be receiving financial breaks from Meidinger.

But Kieffer, another garbage hauler, was also hauling material into the landfill which was declared as alternative cover. Kieffer declared more than 700 tons of alternative cover at the landfill during pertinent times. That Kieffer declared loads as alternative cover is inconsistent with Ragnone's conclusions (1) that only sawdust is alternative cover, (2) that only Fish could haul

---

[5]Doc. 63, p. 5, lines 23-25.

sawdust, and tends to be inconsistent with Ragnone's conclusion that Meidinger was accepting bribes from Fish.

Accepting Meidinger's version as true, false testimony was presented to the grand juries which indicted Meidinger:

- Ragnone testified that alternative cover is sawdust. But alternative cover is not exclusively sawdust.

- Ragnone testified Meidinger accepted money in exchange for cutting breaks for Fish drivers. But the money given to Meidinger was Christmas gratuities amounting to no more than $200 and he did not knowingly cut breaks to Fish drivers.

On September 7, 2012, Fish Garbage confessed judgment in a civil lawsuit commenced by the City of Rapid City.[6] In a sworn confession of judgment Clifford Fish as president of Fish Garbage Service, Inc. said that Fish Garbage Service at times after 2003 misidentified refuse to obtain a financial benefit for Fish Garbage Service. He also said that Fish Garbage Service recognized that the City relied upon the representations of Fish about the contents of its loads. Nothing in the Confession of Judgment implicated Meidinger. Rather, the Confession of Judgment tends to exonerate Meidinger inasmuch as it asserted "the city relied upon the representations" of Fish.

Meidinger was also sued by Rapid City in the same lawsuit. The lawsuit against him was dismissed at sometime after Fish confessed judgment.

## V.
## DISCUSSION

**A.   ABSOLUTE IMMUNITY: Kooiker's Motion To Dismiss As A Matter Of Law Based On Legislative Immunity.**

---

[6]Doc. 67.

7

Kooiker moves to dismiss Meidinger's lawsuit as a matter of law. Kooiker urges that because he was an alderman on the city council in Rapid City at pertinent times he is absolutely immune from being sued for activities connected with city council functions. "Reading the complaint liberally and taking its allegations as true"[7] Kooiker is not protected by absolute, legislative immunity.

Legislative immunity is rooted in the Speech or Debate clause of the South Dakota Constitution as well as the United States Constitution.[8] The South Dakota Constitution provides:

> Senators and representatives shall, in all cases except treason, felony or breach of the peace, be privileged from arrest during the session of the Legislature, and in going to and returning from the same; and *for words used in any speech or debate in either house they shall not be questioned in any other place.*[9]

"A local legislator is entitled to absolute legislative immunity for acts undertaken within the sphere of legitimate legislative activity. . . . For example, passing an ordinance is a legislative act."[10] "Hiring and firing of specific individuals generally is not protected by legislative immunity because it is an administrative action. . . . . In contrast, the wholesale elimination of a position is considered legislative action protected by legislative immunity because it may have prospective implications that reach well beyond the particular occupant of the office."[11]

---

[7]*Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 611 (8th Cir. 1980).

[8]Charles Alan Wright et al, Federal Practice and Procedure, § 3573.3 Section 1983 actions—Defenses: Official Immunity and Res Judicata.

[9]South Dakota Constitution, Article III, § 11 (italics added). See also U.S. Constitution, Article I, § 6.

[10]*Leapheart v. Williamson*, 705 F.3d 310, 313 (8th Cir. 2013) (internal quotation marks omitted).

[11]*Leapheart,* 705 F.3d at 314.

Judge Richard W. Roberts, district judge for the District of Columbia, recently gathered

precedent and described the principles of legislative immunity:

> In determining whether legislative immunity applies, a court asks whether the action
> at issue was undertaken within the legislative sphere. *Williams v. Johnson*, 597
> F.Supp.2d 107, 113 (D.D.C.2009) (citation omitted). Once the legislative act test is
> met, immunity is absolute, *id.* at 115 (quoting *MINPECO, S.A. v. Conticommodity
> Services, Inc.*, 844 F.2d 856, 862 (D.C.Cir.1988))—even if the legislator's conduct,
> if performed in other ... contexts, would ... be unconstitutional or otherwise contrary
> to law. *Brown*, 62 F.3d at 415 (quoting *Doe v. McMillan*, 412 U.S. 306, 312–13, 93
> S.Ct. 2018, 36 L.Ed.2d 912 (1973)). However, only purely legislative activities,
> *United States v. Brewster*, 408 U.S. 501, 512, 92 S.Ct. 2531, 33 L.Ed.2d 507
> (1972)—i.e., acts inherent in the legislative process, are protected. *Chastain v.
> Sundquist*, 833 F.2d 311, 314 (D.C.Cir.1987). Such acts must be an integral part of
> the deliberative and communicative processes by which Members participate in
> committee and House proceedings with respect to the consideration and passage of
> rejection of proposed legislation. *Id.* (quoting *Gravel v. United States*, 408 U.S. 606,
> 625, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972)). Protected legislative acts include
> delivering an opinion, uttering a speech, or haranguing in debate; proposing
> legislation; voting on legislation; making, publishing, presenting, and using
> legislative reports; authorizing investigations and issuing subpoenas; holding
> hearings; and introducing material at Committee hearings. *Williams*, 597 F.Supp.2d
> at 113–114 (quoting *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 9
> (D.C.Cir.2006)). The Clause also protects a legislature's efforts to acquire
> information during formal committee investigations." *Id.* at 114.

> Neither the Supreme Court nor the D.C. Circuit has reached the issue of whether
> informal information-gathering falls within the legislative sphere. *Id.* At least two
> decisions in this district nonetheless have held that such information-gathering is
> protected ... so long as the information is acquired in connection with or in aid of an
> activity that qualified as legislative in nature. *Id.* (quoting *Jewish War Veterans*, 506
> F.Supp.2d at 57.) These opinions reason that **at the end of every protected informal
> information-gathering venture is a formal legislative act** ... such as a piece of draft
> legislation, or ... a meeting to help push through a pending bill. *Jewish War Veterans*,
> 506 F.Supp.2d at 56–57; see also *Williams*, 597 F.Supp.2d at 114. The acquisition
> of knowledge through informal sources is a necessary concomitant of legislative
> conduct and thus should be within the ambit of the privilege so that congressmen are
> able to discharge their constitutional duties properly. *Jewish War Veterans*, 506
> F.Supp.2d at 55 (quoting *McSurely v. McClellan*, 553 F.2d 1277, 1287
> (D.C.Cir.1976)).

That legislators generally perform certain acts in their official capacity ... does not necessarily make all such acts legislative in nature. *Gravel*, 408 U.S. at 625, 92 S.Ct. 2614. Legislators may cajole, and exhort with respect to the administration of a federal statute—but such conduct, though generally done, is not protected legislative activity. *Id.* at 625, 92 S.Ct. 2614; *Hutchinson v. Proxmire*, 443 U.S. 111, 122 n. 10, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) ("Regardless of whether and to what extent the ... Clause may protect calls to ... agencies seeking information, **it does not protect attempts to influence the conduct of executive agencies** or libelous comments made during the conversations"); accord *Williams*, 597 F.Supp.2d at 117 ("a legislator's efforts to cajole or influence an executive agency—as opposed to a legislator's information-gathering or investigative efforts—are not protected by legislative immunity."). Neither does the Speech or Debate Clause reach ... an attempt to influence an executive agency that is in no wise related to the due functioning of the legislative process." *United States v. Johnson*, 383 U.S. 169, 172, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966); accord *Jewish War Veterans*, 506 F.Supp.2d at 54. The D.C. Circuit also has held that "personnel actions regarding the management of congressional food services are too remote from the business of legislating to rank 'within the legislative sphere.' " *Walker v. Jones, 733 F.*2d 923, 928 (D.C.Cir.1984). These political—as distinct from legislative—acts are "beyond the coverage of the Speech or Debate Clause." *Jewish War Veterans*, 506 F.Supp.2d at 53–54.[12]

. . . .

**The termination of a city employee does not serve the purpose of gathering information to guide a legislative vote.**[13]

Kooiker's information gathering and attempts to influence are not protected by the Speech or Debate Clause. In essence, Kooiker heard from two constituents. Kooiker conveyed the information to a supervisor city employee . When the supervisor did not accept Kooiker's accusations, Kooiker told the police department. That was the end of Kooiker's activity although Kooiker continued with his accusations as a major part of his campaign to be elected mayor of Rapid City. The police department then investigated Kooiker's accusations.

---

[12]*Payne v. District Of Columbia,* 859 F.Supp.2d 125, 132-135 (D.D.C. 2012) (internal quotation marks and brackets omitted) (emphasis added).

[13]*Id.* (emphasis added).

10

There was no formal legislative act at the end of Kooiker's information-gathering venture. Instead a criminal investigation was begun by the police department and a specific city employee was immediately fired after being interrogated. A position within the City's employee structure was not eliminated, but a specific employee was. Elimination of a position by city ordinance voted upon by the city council at the end of Kooiker's information-gathering venture would have been a legislative function for which Kooiker would have been protected by legislative immunity. But termination of a specific city employee, Meidinger, without eliminating his position is an administrative function, not a legislative function. The formal action which followed Kooiker's information-gathering venture was performed by the police department. The police department is not a legislative arm of city government. At the end of Kooiker's information gathering activities there was not a draft ordinance or a meeting about a pending ordinance.

Meidinger alleges in his complaint that the defendants' actions led to his being fired and charged criminally.[14] It is not within the legislative sphere when information gathering (1) is about a specific employee (2) and is instigated by and conducted by a single alderman (3) as a result of information the alderman received from a private citizen (4) and is not instigated by the waste management committee or the city council (5) and is not in connection with consideration of a city ordinance by the city council (6) and at the conclusion of the information-gathering venture a specific employee is fired (7) but his position is not eliminated (8) and the formal action which follows the information-gathering venture is conducted by the police department. Rather, such conduct describes an activity which is within the administrative sphere.

_____

[14]Doc. 1, p. 3, ¶ 7.

11

Absolute legislative immunity, i.e. the Speech and Debate Clause, protects purely legislative activity within the legislative sphere. Kooiker's alleged information gathering on his own and his alleged attempts to influence an executive agency (the police department) directed at a specific, suspect employee at the landfill were not in aid of an activity that was legislative in nature. Consequently, Kooiker is not absolutely immune from being sued by Meidinger. Kooiker's motion to dismiss Meidinger's lawsuit because Kooiker is absolutely immune should be DENIED. Kooiker's motion to amend his answer is contemporaneously DENIED as moot.[15]

## B.   QUALIFIED IMMUNITY.

### 1.   Summary Judgment Standard.

Summary judgment is appropriate when the evidence viewed in the light most favorable to the nonmoving party presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. . . . The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *White v. McKinley*, 519 F.3d 806, 813 (8th Cir.2008). Qualified immunity shields government officials from personal liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known. *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir.2009). Evaluating a claim of qualified immunity requires a two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Id.* at 496 (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). The defendants are entitled to qualified immunity unless the answer to both of these questions is yes. *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir.2012). A court may exercise its discretion in deciding which of the two prongs of the qualified immunity analysis to take up first. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).[16]

---

[15]Kooiker is nevertheless entitled to summary judgment because he is protected by qualified immunity as explained in Section 4(c) below.

[16]*Winslow v. Smith*, 696 F.3d 716, 730-31 (8th Cir. 2012) (internal quotation marks and brackets omitted).

### 2.   Clearly Established.

The constitutional right to be free from the use of false evidence to secure a conviction was clearly established long before the pertinent times here.[17]

### 3.   Violation Of A Constitutional Right.

#### a.   Meidinger's Claim Under The Fourteenth Amendment Fails, But His Fourth Amendment Claim Is Viable Against Peter Ragnone.

Meidinger argues his constitutional rights were violated under the Fourth and Fourteenth Amendments . ". . . . [I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."[18] There is a constitutional right under the Fourth Amendment to be seized only upon "a truthful factual showing sufficient to constitute probable cause before an arrest warrant can issue."[19]   Meidinger's claim about false testimony to the grand jury (Ragnone's confession and sawdust testimony) is covered specifically by the Fourth Amendment, so it is analyzed under the Fourth Amendment.  As explained below his Fourth Amendment claim presents questions for a jury to resolve.  Meidinger's reckless investigation and manufactured evidence claims are not covered specifically under the Fourth Amendment, so they are analyzed under the Fourteenth Amendment.

---

[17]Winslow, 696 F.3d at 738.

[18]*U.S. v. Moran*, 296 F.3d 636, 646 (8th Cir. 2002) quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 843, 118 S.Ct. 1708 (1998).

[19]*U.S. v. Moody*, 23 F.3d 1410, 1412 (8th Cir. 1994).

13

**b.     Fourteenth Amendment: Reckless Investigation And Manufactured Evidence.**

Meidinger's substantive due process claims are derived from his liberty interest in fair criminal proceedings.

> The Due Process Clause of the Fourteenth Amendment provides that no State ... shall ... deprive any person of life, liberty, or property, without due process of law. U.S. Const. amend. XIV, § 1. To breach the shield of qualified immunity by establishing a violation of substantive due process rights by an ... official, a plaintiff must show (1) that the official violated one or more fundamental constitutional rights, and (2) that the conduct of the ... official was shocking to the 'contemporary conscience.[20]

Meidinger asserts his right to a fair proceeding was violated because there was a reckless investigation which ignored exculpatory evidence and because evidence was created to fill in gaps to make the state's case stronger.

> To establish a constitutional violation based on an inadequate investigation, a plaintiff must show that the defendant officer's failure to investigate was intentional or reckless, thereby shocking the conscience. We have held that the following circumstances indicate reckless or intentional failure to investigate that shocks the conscience: (1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence. Mere negligent failure to investigate, such as failing to follow up on additional leads, does not violate due process.
>
> While a reckless investigation claim may be supported by proof that investigators exerted systematic pressure to implicate the defendant in the face of contrary evidence, a manufactured false evidence claim requires proof that investigators deliberately fabricated evidence in order to frame a criminal defendant.... As in this case, a failure to investigate claim may be inextricably bound with a false evidence claim, where the Plaintiffs' theory is that investigators recognized deficiencies in a case and manufactured false evidence to fill those gaps.[21]

---

[20]Winslow, 696 F.3d at 731 (internal citations, quotation marks and brackets omitted).

[21]Winslow, 696 F.3d at 732 (internal citations and quotation marks omitted).

Meidinger relies on *Moran v. Clarke* [22]to support his reckless investigation claim. *Moran* was a case in which the police mistakenly thought a mentally impaired teenager was caught in the act of burglary. Through a series of tragic events the teenager was beaten leaving him with severe lacerations and a broken ankle. The police chief publically acknowledged the mistake and committed himself to punishing the wrongdoers. Policeman Moran became the subject of the investigation, was charged criminally and was acquitted at trial. Meidinger was not singled out because of his race, as possibly occurred in *Moran*. Unlike *Moran* Meidinger was given a name clearing opportunity to respond—Ragnone interviewed him. Unlike *Moran*, Meidinger was on the scene of the incident. Unlike *Moran*, the Rapid City Police Department was not embarrassed by police misconduct which triggered an investigation to which the police department publically and financially committed itself to find a culprit for wrongdoing before any wrongdoing was actually established. Unlike *Moran,* the Rapid City Police Department was not investigating and defending itself. The investigation was to discover the nature and extent of fraud at the landfill. That Ragnone believed Fish and Meidinger were the culprits does not make his investigation reckless, unfair or outrageous nor does it shock the conscience. Unlike *Moran*, Meidinger has not offered sufficient evidence to support his argument of a police conspiracy to manufacture, and the manufacture of, false evidence designed to falsely formulate a pretense of probable cause to deprive Meidinger of liberty. Meidinger identifies as false or manufactured evidence an exhibit prepared by the State's expert which erroneously includes days when Meidinger was not at work operating the scale. The exhibit was erroneous as a result of Ragnone's failure to provide correct or complete information to the State's expert. But there are other days included within the exhibit when Meidinger was at work

---

[22]*Moran v. Clarke*, 296 F.3d 638 (8th Cir. 2002).

operating the scale when misidentified material was allowed to cross the scale. There is nothing in the record except the assertion itself to support the conclusion that false evidence was intentionally created by a mind bent on incriminating Meidinger. Meidinger points to Anderson as being an unreliable confidential informant because Anderson himself delivered many misidentified loads to the landfill. But Anderson worked for Fish so Anderson's misidentified loads counted against Fish. It has been established that Fish defrauded the City by misidentifying loads of alternate cover. What Anderson told Ragnone about Fish Garbage Service turned out to be true. Anderson did not finger Meidinger as an inside man.[23]

Meidinger also relies on *White v. McKinley*[24] to support his reckless investigation charge. In *McKinley* the investigating police detective developed a romantic relationship with the ex-wife of the husband White who was criminally charged with molesting his adopted daughter. Unlike *McKinley*, there is no evidence that Ragnone was steering the investigation to benefit his own special interest.

Meidinger also relies on *Winslow v. Smith*[25] to support his reckless investigation claim. In *Winslow* four persons who entered pleas of guilty, nolo contendere, or no contest to charges of second degree murder were later granted full pardons as a result of DNA testing. Unlike *Winslow*, there is no evidence that Ragnone forced vulnerable witnesses to agree to something which was not true. Unlike *Winslow*, there is no evidence of coaching witnesses to give false testimony. Unlike

---

[23]Doc. 66, Ex. 16. Ragnone's report of his interview with Donald Anderson credits Anderson for identifying the involved persons in suspicious activity between Fish Garbage Service and the landfill as Cliff Fish, Chuck Cordes, and Steve Pope.

[24]*White v. McKinley*, 519 F.3d 806 (8th Cir. 2007).

[25]*Winslow v. Smith*, 696 F.3d 716 (8th Cir. 2012)

16

*Winslow*, there is no evidence Ragnone ignored evidence which would have exonerated Meidinger. It is true Ragnone ignored that Kieffer delivered material to the landfill which was not sawdust but was identified as alternate cover. The Kieffer evidence tends to exonerate Meidinger as the inside man, but is not mutually inconsistent with his being the inside man. And there is no evidence to support the conclusion Ragnone intentionally or recklessly ignored the Kieffer evidence as distinguished from negligently ignored the evidence. Unlike *Winslow*, Ragnone did not have multiple opportunities to see the evidence he was gathering did not support his theory that Fish was misidentifying material as alternate cover and that the inside man was Meidinger. He may have been wrong about Meidinger, but that is not the same as ignoring evidence which did not support his theory. In *Winslow,* the jury could reasonably find the investigation included coercing and threatening three witnesses to provide false testimony. The *Winslow* investigation purposefully ignored that no witness could independently provide testimony about details of the crime. The *Winslow* investigation included the exertion of undue pressure to implicate the plaintiff or to improperly strengthen the state's case against plaintiffs. None of that happened to Meidinger.

There is no violation of Fourteenth Amendment rights unless there was a reckless investigation which was used to deprive Meidinger of his constitutional rights.[26] The evidence used by the grand jury to indict Meidinger was Ragnone's testimony about Meidinger's confession and Ragnone's testimony about the volume of misidentified material delivered to the landfill by Fish Garbage which was not sawdust. Leahy testified there was no other significant fraud at the landfill. Apart from Ragnone's testimony about Meidinger's confession and sawdust which are analyzed below under the Fourth Amendment, there is no potentially material, predicate false or manufactured

---

[26]Winslow, 696 F.3d at 735.

evidence from Ragnone's investigation which was used to persuade the grand jury to indict Meidinger. The issue about Kieffer's loads of alternate cover is not by itself a material, predicate fact. An intentional failure to testify about Kieffer's loads of alternate cover in the absence of Ragnone's testimony about the confession and sawdust issues could not have caused the grand jury to indict Meidinger.

It is "only in the rare situation when the state action is truly egregious and extraordinary will a substantive due process claim arise."[27] "Substantive due process is concerned with violations of personal rights . . . so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to brutal and inhumane abuse of official power . . . ."[28] "To establish a constitutional violation based on an inadequate investigation, [Meidinger] must show that [Ragnone's] failure to investigate was intentional or reckless, thereby shocking the conscience. . . . [T]he following circumstances indicate reckless or intentional failure to investigate that shocks the conscience: (1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that the investigators purposefully ignored evidence suggesting [Meidinger's] innocence, (3) evidence of systematic pressure to implicate [Meidinger] in the face of contrary evidence."[29]

Ragnone's interrogation of Meidinger was aggressive, but not coercive. The only evidence Ragnone ignored was that Kieffer delivered 700 tons of material declared as alternate cover. While

---

[27]Winslow, 696 F.3d at 736 (internal citation and quotation marks omitted).

[28]*Id.* (internal citation and quotation marks omitted).

[29]Winslow, 696 F.3d at 732 (internal citations and parenthesis omitted, brackets used to substitute Meidinger's name).

perhaps helpful to Meidinger's defense to the charge he was the inside man for Fish, that fact is not mutually inconsistent with Meidinger's complicity with Fish.  There was no systematic pressure on Meidinger or on anyone else to implicate Meidinger.  Meidinger's constitutional right to a fair investigation under the Fourteenth Amendment Due Process Clause was not violated.  There was not a reckless investigation in which Meidinger was coerced or threatened or in which evidence suggesting Meidinger's innocence was purposely ignored or in which there was systemic pressure on witnesses to implicate Meidinger.  Meidinger has not offered sufficient evidence to show Ragnone's investigation violated Meidinger's substantive due process right to a fair investigation.

### c.   Fourth Amendment:  Peter Ragnone.

Meidinger's evidence is that Ragnone told two material falsehoods to two grand juries: (1) that Meidinger confessed to knowingly cutting breaks to Fish drivers and (2) that alternative cover is exclusively sawdust.  Meidinger has  presented sufficient evidence to allow the reasonable inference there was false testimony.

### i.   Meidinger Was Seized Even Though He Surrendered Voluntarily.

It is concluded Meidinger was seized as contemplated by the Fourth Amendment even though he voluntarily surrendered instead of waiting to be arrested pursuant to the arrest warrant which was issued after he was indicted by the grand jury.[30]  With respect to property the Eighth Circuit Court of Appeals said ". . . seizure connotes a forcible dispossession from the owner, not a voluntary surrender, . . . ."[31]  Because Meidinger's choices were limited to either being arrested or voluntarily

---

[30]Doc. 41, Ex. E.

[31]*Caldwell v. United States*, 338 F.2d 385, 388 (8th Cir. 1964).

19

surrendering, he was forcefully dispossessed of his freedom, so he was seized as contemplated by the Fourth Amendment. This is the same conclusion as Chief Justice Rehnquist reached in writing a majority opinion in which he wrote "nor does he claim a violation of his Fourth Amendment rights, notwithstanding the fact that his surrender to the State's show of authority constituted a seizure for purposes of the Fourth Amendment."[32]

### ii.   Analysis Overview.

Information to establish probable cause "must be truthful in the sense that the information put forth is believed or appropriately accepted by the affiant as true."[33]   Ragnone urges he is protected from suit by qualified immunity. The party asserting qualified immunity carries the burden to prove the relevant predicate facts.[34] The nonmoving party is given the benefit of all reasonable inferences.[35] "If there is a genuine dispute concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment."[36]

Both Ragnone's testimony about Meidinger's confession and Ragnone's testimony about sawdust are material, predicate facts about which there is a genuine dispute.  If Meidinger did not confess but Ragnone inappropriately testified to the grand jury that he did, then it is a violation of Meidinger's constitutional right under the Fourth Amendment to be seized only upon "a truthful

---

[32]*Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 812, 127 L. Ed. 2d 114 (1994).

[33]*U.S. v. Moody*, 23 F.3d 1410, 1412 (8th Cir. 1994).

[34]*White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008).

[35]*White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008).

[36]*Id.*

factual showing sufficient to constitute probable cause before an arrest warrant can issue."[37] The

same conclusion applies to the sawdust issue. Ragnone testified to the grand jury that only sawdust

is alternate cover so that every load Fish delivered to the landfill which came from a source other

than Merillat was necessarily fraudulent because the load could not possibly be sawdust. In order

to implicate Meidinger it needs to be established that Fish needed an inside man. That there are

hundreds of misidentified loads tends to prove the need for an inside man. Ragnone carries the

burden to prove there is not a genuine dispute about the predicate facts that Meidinger confessed and

that sawdust is the only alternate cover.

Giving Meidinger the benefit of all reasonable inferences, despite his admissions about

cutting Fish financial breaks and receiving money from Fish, he did not confess and sawdust is not

the only material which is alternate cover. Ragnone inappropriately accepted as true that Meidinger

confessed and that sawdust is the exclusive alternate cover. Meidinger said he unknowingly cut the

breaks for Fish and the money he received was Christmas gratuities not given in exchange for

financial favors to Fish. Ragnone was informed in an email from John Leahy before he testified to

the first grand jury that sawdust was not the only material which is alternate cover.

Whether Ragnone's testimony about Meidinger's confession and sawdust as the only

alternate cover was truthful in the sense that the information put forth is believed or appropriately

accepted by Ragnone as true are material, predicate fact issues for the jury to decide. Whether

Ragnone appropriately accepted what Meidinger told him as a confession and whether Ragnone

appropriately accepted that sawdust was the exclusive alternate cover "depend on interpretation of

the evidence, the drawing of inferences and evaluation of witness credibility. These remain the

---

[37]*Moody*, 23 F.3d at 1412 (internal quotation marks omitted).

province of the jury."[38]  Ragnone has not carried the burden to prove there are no genuine disputes about material facts regarding the truthfulness of his testimony to the grand juries.  Consequently he is not protected by qualified immunity.  Ragnone's motion for summary judgment regarding the Fourth Amendment should be denied.

### iii.    Confession Testimony.

Ragnone testified to two grand juries that Meidinger confessed to accepting money in exchange for cutting breaks to Fish drivers.[39]  Ragnone's testimony that Meidinger confessed was a half truth.  It was not the truth, the whole truth and nothing but the truth.  The transcript of Ragnone's interview with Meidinger reveals Ragnone persistently pursued a confession from Meidinger, which is legal and appropriate.  But the transcript also reveals Meidinger persistently denied accepting money in exchange for financial favors to Fish Garbage Service.  Specifically Meidinger's evidence is:

- that it was Christmas time when he received money from Fish;

- that he received $100 on two occasions years before the interview of September 11, 2009, because Fish retired years ago;

- that Meidinger denied intentionally allowing Fish to dump at reduced or free rates.[40]

The 53 page transcript of Ragnone's interrogation is summarized in an appendix to this opinion.  After interviews with other landfill employees Ragnone had a "good idea of what was

---

[38]*Moran v. Clarke*, 296 F.3d. 638, 648 (8th Cir. 2002).

[39]Doc. 63, p. 14, lines 2-18; Doc. 65, p. 15 beginning at line 12 through p. 18 ending at line 22.

[40]Doc. 62-1, p. 51-52.

happening."[41]  The interview reveals Ragnone believed Meidinger was the inside man being bribed

by Fish for allowing Fish trucks to misidentify material as alternate cover so that Fish would pay a

reduced fee or pay nothing for hundreds of loads being dumped at the landfill.  Ragnone believed

Meidinger was lying about accepting money when Meidinger protested that he received $200 at

Christmas time so the money was in the nature of Christmas gratuities rather than in exchange for

allowing Fish financial favors.  Meidinger denied *knowingly* cutting breaks to Fish and sawdust is

not the only material which is alternate cover.  A jury could reasonably conclude Ragnone

inappropriately accepted that Meidinger confessed or that Ragnone intentionally testified falsely

when he testified that Meidinger confessed.  A jury likewise could reasonably conclude Ragnone

inappropriately accepted that sawdust is the exclusive material which is alternate cover or that he

intentionally testified falsely  when he told the grand jury that sawdust is the exclusive material

which is alternate cover.

     Intentional false testimony constitutes fabrication of evidence:

> When a police officer creates false information likely to influence a jury's decision
> and forwards that information to prosecutors, he violates the accused's constitutional
> right to a fair trial, and the harm occasioned by such an unconscionable action is
> redressable in an action for damages under 42 U.S.C. § 1983. Here, a reasonable jury
> could find, based on the evidence, that defendants Lopez and Wheeler violated the
> plaintiffs' clearly established constitutional rights by conspiring to fabricate and
> forward to prosecutors a known false confession almost certain to influence a jury's
> verdict. These defendant police officers are not entitled to summary judgment on the
> ground of qualified immunity. Qualified immunity is unavailable where, as here, the
> action violates an accused's clearly established constitutional rights, and no
> reasonably competent police officer could believe otherwise.[42]

---

[41]Doc. 63, p 10, lines 9-10.

[42]*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2nd Cir. 1997) (internal citations
omitted).

23

In connection with Ragnone's testimony to the grand jury that Meidinger feels Fish owes him "a few thousand dollars, realizing how much he had let go through the scale house," Ragnone testified it became clear (as he put it) "that both the owners had either offered or attempted to offer the scale house operator to show favoritism at the landfill."[43]  Ragnone failed to tell the grand jury the rest of Meidinger's explanation on that subject— (1) that Meidinger never received any money from Fish except at Christmas time; (2) that Meidinger said "I never have" when Ragnone asked whether he had ever fixed the weight on the scale to give Fish a lighter weight on their load; and (3) that the only thing he ever allowed them to do was to dump material other than what they were saying was in the material and even then it was not because they were friends of his or because he got $50 at Christmas time.  Ragnone's half truth precluded the grand jury from concluding that Meidinger received Christmas gratuities from Fish as distinguished from money in exchange for financial favors and precluded the grand jury from concluding that Meidinger did not knowingly cut breaks for Fish drivers.

#### iv.   Sawdust Testimony.

A jury could reasonably find that Ragnone intentionally testified falsely to the grand jury that alternate cover is exclusively sawdust–"it's the same stuff that you would sweep off your garage floor if you cut a board or was building a deck. It's just that, it's sawdust."[44]  But Ragnone had been informed on April 27, 2010, before his first grand jury testimony that sawdust was not the exclusive alternate cover.[45]  John Leahy told Ragnone in his memo that in addition to Concover, "[o]ther items

---

[43]Doc. 63, Ex. 10, p. 14, lines 19-22.

[44]Doc. 63, pp 6-7, line 22-line 1.

[45]Doc. 65-1, Ex. 12, p. 2.

such as sawdust/glue from Merilatt, soil contaminated with heavy hydrocarbons, street sweepings, etc. are used as cover intermittently during daily operations." A jury could reasonably conclude that alternate cover is not exclusively sawdust. Foundational to Ragnone's testimony is the theory that if only sawdust is alternate cover and if Merillat is the only producer of sawdust who needs a garbage hauler to haul its sawdust to the landfill and if Fish is the only garbage hauler who hauls for Merillat, then every load hauled by Fish from any customer other than Merillat which is declared as alternate cover is misidentified because it cannot possibly be sawdust.

But then any load hauled by *any other garbage hauler* which is declared as alternate cover is also misidentified. Kieffer dumped more than 700 tons of alternate cover at the landfill. Leahy told the grand jury there was no other "significant fraud by any other company" at the landfill.[46] Ragnone testified Fish was cheating the landfill but did not testify Kieffer was cheating the landfill. Ragnone testified Fish was bribing Meidinger but did not testify Kieffer was bribing Meidinger. Ragnone's testimony to the grand jury implicates only Fish and Meidinger. But both Fish and Kieffer were declaring alternate cover. None of Kieffer's alternate cover was sawdust, but some of Fish's alternate cover was. A jury could reasonably conclude Ragnone falsely and knowingly accused Meidinger of being the inside man who was bribed to allow Fish drivers to misidentify material as alternate cover.

It is emphasized this discussion is not meant to accuse Kieffer of wrongdoing. It is meant to illustrate the false foundation in Ragnone's investigation and testimony. Because the foundation for Ragnone's testimony is (1) that sawdust is the exclusive type of alternate cover and (2) that only Merillat needed a commercial hauler for sawdust and (3) that only Fish had a contract to haul

---

[46]Doc. 67-1, p. 3, lines 3-9.

sawdust for Merillat, so that any load Fish delivered from any customer other than Merillat which was identified as alternate cover was necessarily not sawdust and was necessarily falsely identified as alternate cover. The importance of his false theory is illustrated by Kieffer's delivery of more than 700 tons of alternate cover, virtually none of which could possibly have been sawdust under Ragnone's investigative theory and his testimony to the grand jury. If Ragnone's testimony is true, then Kieffer was also falsely identifying material as sawdust i.e. alternate cover. But because sawdust is not the only material which is alternate cover, Kieffer was legitimately identifying material which was not sawdust as alternate cover. The conclusion is that if Kieffer could legitimately identify material which was not sawdust as alternate cover, so could Fish.

For Meidinger this conclusion is critically important. Ragnone testified any material which was falsely identified as sawdust was a fraud on the city. Because Fish delivered so much non-sawdust material to the landfill which was identified as alternate cover, i.e. sawdust, Fish needed an inside man at the landfill who would let them get away with the scam. But nobody thought Kieffer was scamming the city. And Kieffer, according to Ragnone's theory, was doing the same as Fish. If Fish needed an inside man, then so did Kieffer. That Meidinger was not an inside man for Kieffer tends to prove he was not necessarily an inside man for Fish either.

Finally, that Kieffer was delivering non-sawdust material which was legitimately identified as alternate cover does not compel the conclusion that Fish's deliveries of non-sawdust material were also always legitimate. A jury could reasonably conclude Meidinger's innocence is consistent with Fish's fraud. A jury could reasonably conclude Fish both (1) committed a fraud at the landfill and (2) acts of kindness at Christmas time. A jury could reasonably conclude the city and its employee Meidinger relied on the representations of Fish drivers— exactly what Clifford Fish said in his sworn

26

Confession Of Judgment— without complicity from Meidinger. And exactly as Meidinger said in his transcribed interview with Ragnone when he protested he did not *knowingly* cut breaks for Fish drivers.[47] A jury could reasonably conclude Ragnone inappropriately or intentionally testified falsely to the grand jury both about Meidiner's alleged confession and about sawdust as the only alternate cover, so that false factual evidence was used to indict Meidinger in violation of the Fourth Amendment.

### v. Inspection Policy and Loads Across the Scale When Meidinger Was Not Working.

Meidinger's asserts that Ragnone fabricated evidence about an inspection policy and that Ragnone failed to disclose to the State's expert witness the loads of alternate cover that came across the scale when Meidinger was not working. These are not material, predicate facts sufficient to defeat qualified immunity for Ragnone. Ragnone's testimony to the grand jury about the existence of an inspection policy is not even established, let alone established as intentional false testimony. Ragnone testified to the March 4, 2010 grand jury that Dave Holtz was in the habit of inspecting loads, but Darrel Bishop was not.[48] There is nothing in the record to show that Ragnone testified about an inspection policy to the March 31, 2011, grand jury.[49] There were misidentified loads that came across the scale when Meidinger was working. And there were some misidentified loads which came across the scale when Meidinger was not working which were erroneously included in the exhibit prepared by the State's expert. That fact affects only the number of misidentified loads

---

[47]Doc. 63, p. 14, lines 14-22 and Doc., 62-1, pp. 22-25.

[48]Doc. 63, Ex. 10, p. 9, lines 6-15.

[49]Doc. 65-4, Ex. 15.

27

which came across the scale when Meidinger was working. It doesn't change the fact that Meidinger was working when some misidentified loads came across the scale.

### vi. Defendants' Better Version of Facts Argument.

The defense argues "a party is not allowed to claim a better version of the facts more favorable to [himself than his own testimony] in an attempt to avoid summary judgment."[50] The thread of cases about this principle leads back to a case from 1895 in which the reason for the rule is explained:

> However, entirely regardless of the weight or credibility of Johnson's testimony, we believe it is the better and the sounder view that respondent cannot, under the circumstances shown by this record, claim the benefit of a version of relevant facts more favorable to her contentions than she herself has given in her own testimony. As well stated by Lumpkin, J., in *Western & A. R. Co. v. Evans* (1895) 96 Ga. 481, 23 S. E. 494, 495, "Every witness is under a solemn obligation to tell the truth, the whole truth, and nothing but the truth; and this obligation is especially binding upon one who seeks, by his own testimony, to establish a substantial right against another. *Railway Co. v. Beauchamp*, 93 Ga. 6, 19 S. E. 24. It surely can never be unfair to a party laboring under no mental infirmity to deal with his case from the standpoint of his own testimony as a witness."[51]

The defense asserts "Meidinger's own testimony clearly indicated that he does not have any facts to support his claim" and cites the transcript of his deposition:

> Q:   Okay. And do you have – can you point to any evidence that was presented to any, either grand jury or trial jury, can you point to any evidence that was brought by the state that you suggest was fabricated evidence? And you know what fabricated evidence is, Randy?
>
> A:   It would be stuff that was made up by somebody.

---

[50]Doc. 79, p. 11, citing *Pickett v. Colonel of Spearfish*, 209 F.Supp.2d 999, 1006 (D.S.D. 2001) (citing *Anderson v. Production Credit Ass'n*, 482 N.W.2d 642, 648 (S.D.1992)).

[51]*Miller v. Stevens*, 63 S.D. 10, 256 N.W. 152, 155 (1934).

Q:    Okay. And to follow that up then, can you point to any fabricated evidence, as you understand that term to be, of any evidence presented to a grand jury or a trial jury that you suggest was fabricated evidence brought by any of the witnesses that testified on behalf of the state?

A:    I'm not sure if I could at this time.

2 Meidinger Dep. 196:9-22.

Q:    And similarly, as it concerns the unfair indictments, can you point to any action or actions on behalf of any of the individual defendants or them collectively which you would suggest would support your claim you were unfairly indicted as a result of any one of their individual or collective actions?

A:    I'm not sure if I can answer that at this time, either.

2 Meidinger Dep. 197:11-19.

Q:    There's a suggestion in there that you were subjected to a reckless criminal investigation. Can you point to any specific facts, Randy, or allegations that you would suggest that the city or any of the individually named defendants acted in a manner so as to result in you being inappropriately prosecuted in this case?

A:    I can't answer that at this time.

2 Meidinger Dep. 228:23-229:5.[52]

This argument is a red herring. Meidinger was not asked about the actual facts of his claim. He was asked *to identify the facts which support* his claim. There is a subtle but important difference. Indeed, the defense itself seems to recognize the point when it wrote in a brief— "not disputed that Randall Meidinger as a witness does not have personal knowledge of . . ."[53] These questions called upon Meidinger to form and express legal conclusions and opinions. By way of example to

---

[52]Doc. 79, p. 3.

[53]Doc. 79, p. 2 (". . ." in original).

illustrate, these questions are like asking Meidinger not whether the traffic light was red or green, but whether in his opinion the color of the light supports his claim.

Meidinger's cited testimony and the facts of the case are consistent. Meidinger's cited testimony is not a different version of the facts, let alone a better version of the facts. At issue here are Ragnone's testimony about Meidinger's confession and Ragnone's testimony about alternate cover. The transcript of Ragnone's testimony to the grand jury is to be measured against the transcript of Meidinger's interrogation and against the written definition of alternate cover. Those writings are indisputable facts. It is the interpretation of these written facts about which there is a dispute.

It is a closer question when considering Meidinger's testimony about alternate cover. These are the materials which qualify as alternate cover:

- The memorandum from John Leahy to Ragnone identifies alternative cover as "sawdust/glue from Merilatt, soil contaminated with heavy hydrocarbons, street sweepings, etc."[54]

- The faxed message from Jerry Wright to commercial haulers provides: Alternative cover shall be defined as a non-hazardous waste product containing small homogeneous particle type waste, free of such items as plastic film, putrescible waste, rubbish, metal, lumber, and bulky items, and that it can be used to cover the solid waste. An example would be clean saw dust.[55]

- The memorandum from John Leahy to commercial waste haulers provides: Includes only inert waste products that may be safely used as alternative cover. Material must be non-flammable and have a consistency similar to dirt or sand. Clean saw dust loads that meet the criteria for drop off in the yard waste composting operation may be considered for use as alternative cover. (no plastics, garbage, wood, or other debris will be allowed, contaminated

---

[54]Doc. 65-1, p. 2.

[55]Doc. 65-2, p. 1.

loads will be charged at $55.00 per ton). All loads requesting disposal as alternative cover must be approved by Landfill Operations Supervisor or Sold Waste Operations Superintendent.[56]

However, Meidinger testified:

> Q:   At any time after you began your employment at the landfill, did anyone ever suggest to you that alternative cover was something other than sawdust?
> A:   Not that I can recall.

1 Meidinger Dep. 95:8-12.

> Q:   Okay. And there's an allegation in here that Ragnone proceeded under a premise that alternative cover was sawdust only. And did you generally understand that's what Pete thought, that alternative cover was sawdust?
>
> A:   I believe so.
>
> Q:   And that's the same thing you would have thought, and you had been at the landfill for seven years; right?
>
> A:   Correct.

Meidinger was wrong. Alternate cover is sawdust, but it is indisputably also other materials. It works an injustice to bind Meidinger to a version about which he is clearly wrong when the indisputably correct version happens to be the better version from Meidinger's point view. Alternate cover is what it is defined to be, not what Meidinger thought it to be. What he thought it to be is his opinion. What it is defined to be is the fact. Alternate cover is as defined in the writings of Leahy and Wright to commercial waste haulers.

---

[56]Doc. 68-2, p. 3.

31

### 4.   No Violation Of A Constitutional Right By the Other Individual Defendants.

#### a.   Steve Allender.

Allender is the chief of police. He had no direct involvement in the investigation. He did not testify. There is no evidence of any conduct by Allender which deprived Meidinger of any constitutional right. Allender is protected by qualified immunity and his motion for summary judgment should be granted.

#### b.   John Leahy.

Meidinger argues that Leahy alleged that Meidinger manipulated truck weights which in turn bolstered Ragnone's fraud theory and "subjected Meidinger to systematic implication in the fraud allegations." Leahy testified to the grand jury that he was aware of no other "significant fraud" occurring at the Landfill. He did not fabricate evidence. At most he misinterpreted facts. But there is nothing in the record to justify the conclusion he did so deliberately. That's the difference between negligence and depriving a person of a constitutional right under color of law. "Mere negligent failure to investigate, such as followup on additional leads, does not violate due process."[57] Leahy did not investigate. He is not a member of law enforcement. He was a supervisor at the landfill. He was a witness before the grand jury whose only pertinent testimony was that there is "no other significant fraud at the landfill." There is no evidence his testimony was false. Likewise there is nothing in the record to support the conclusion that Leahy believed his testimony was false, even if it is pretended there was fraud at the landfill other than Fish. Leahy is protected by qualified immunity and his motion for summary judgment should be granted.

---

[57]Winslow, 696 F.3d at 732.

32

### c.    Sam Kooiker.

While Kooiker was the instigator of the investigation and while he made landfill fraud issue

the centerpiece of his campaign for mayor, he did not deprive Meidinger of any constitutional right.

He did not testify to the grand jury, so he did not offer false testimony against Meidinger.  He did

not knowingly fabricate any evidence which was used against Meidinger.  He may have been wrong

to accuse Meidinger, but there is no evidence he believed he was wrong.  He was not a state actor

who investigated the landfill issue.  He was acting as a private citizen, not as a state actor.  It is only

state actors who can be liable for deprivation of another's constitutional rights under color of law

under 42 U.S.C. § 1983.[58] "[T]he under-color-of-state-law element of § 1983 excludes from its reach

'merely private conduct, no matter how discriminatory or wrongful.'"[59]  There is no constitutional

right belonging to Meidinger which Kooiker violated when he made the landfill issue and Meidinger

the focus of his political campaign.  There is nothing in the record which reflects that Meidinger was

fired by Kooiker.  Similarly, Meidinger has not claimed that a constitutional right was violated

regarding his termination of employment.  Kooiker may owe an apology, but not damages under 42

U.S.C. § 1983.  Kooiker is protected by qualified immunity and his motion for summary judgment

should be granted.

---

[58]*Carlson v. Roetzel & Andress*, 552 F.3d 648, 650 (8th Cir. 2008) (internal citations omitted)(Only state actors can be held liable under Section 1983).

[59]*Carlson* at 650 (quoting *Americans United for Separation of Church and State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 421 (8th Cir.2007), (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999)).

**C.    City of Rapid City: *Monell* Claim.**

Meidinger asserts the City of Rapid City is liable under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2035-36, 56 L. Ed. 2d 611 (1978):

> Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision making channels.
>
> .  .  . .   In particular, we conclude that a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.[60]

Liability may be imposed against a municipality for a single decision by a policy maker who has final decision making authority in that area of the government's business.[61]  Meidinger has offered no facts to support his claim against the City except to argue he got sued by the City as a result of the conduct of Kooiker, Ragnone and Leahy, and Allender followed the case closely.  Meidinger argues the City ratified "their actions and the course of action the City took specific to Ragnone's alleged illegal conduct."[62]  It is Ragnone's testimony to the grand jury about an alleged confession by Meidinger and about sawdust which are the keys to Meidinger's lawsuit.  There are no facts showing

---

[60]*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2035-36, 56 L. Ed. 2d 611 (1978).

[61]*Slimgen v City of Rapid City*, 83 F. Supp. 2d 1061, 1066 (D.S.D. 2000) citing *Pembauer v. City of Cincinnati,* 475 U.S. 469, 478, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986).

[62]Doc. 57, p. 21.

that Kooiker or Leahy or Allender had anything to do with Ragnone's alleged false testimony to the grand jury. It is presumed their beliefs about Meidinger's involvement are that Meidinger was the inside man. It is not a violation of Meidinger's rights under the Fourth or Fourteenth Amendments for them to hold those beliefs. And there is no evidence to support the conclusion they thought Meidinger was NOT the inside man and collaborated to frame him anyway. There is no evidence to support the conclusion that either a policy maker for the city had anything to do with Ragnone's alleged false testimony or that it was a policy of the city for its police officers to testify falsely to a grand jury in this single instance or as a matter of custom. Meidinger has not urged that his termination itself, independently from Ragnone's testimony to the grand jury, was a deprivation of a constitutional right. Rather Meidinger argues his constitutional rights were violated by the City's decision to sue Meidinger and the City Council acted to ratify an official policy of the City. "Their action, as argued herein, was grounded on the fabricated involvement of Meidinger, fabrications of its own officers and employees."[63] Rapid City is not vicariously liable under 42 U.S.C. § 1983 for the conduct of its employee Ragnone. The motion for summary judgment by the City of Rapid City should be granted.

### D.    CONSPIRACY.

"To prove a § 1983 conspiracy claim against a particular defendant, the plaintiff must show: that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff."[64] As discussed above, the constitutional deprivation here is tied

---

[63](Doc. 57, p. 22).

[64]*Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999) (internal citations omitted).

35

to Ragnone's alleged false testimony to the grand jury about Meidinger's confession and sawdust. There is no evidence that Kooiker or Leahy or Allender or the City of Rapid City was a party to an agreement for Ragnone to testify falsely to the grand jury or to fabricate evidence against Meidinger. And there is no evidence that Kooiker, Leahy, or Allender did not genuinely believe Meidinger was the inside man. But Ragnone interrogated Meidinger. Ragnone personally heard Meidinger deny knowingly cutting breaks for Fish and Ragnone personally heard Meidinger's claims that the monies he received from Fish were Christmas gratuities. It's for a jury to decide whether what Ragnone heard and testified about was a confession or whether he appropriately accepted it as a confession. There is no evidence in the record from which it can be concluded or inferred there was an agreement to deprive Meidinger of any constitutional right. The conspiracy claim fails as a matter of law.

## VI.
## CONCLUSION

It is respectfully **RECOMMENDED** that the summary judgment motions of Rapid City, Kooiker, Leahy, and Allender be GRANTED. It is respectfully **RECOMMENDED** that Ragnone's motion for summary judgment relating to Meidinger's Fourteenth Amendment claim be GRANTED and that Ragnone's motion for summary judgment relating to Meidinger's Fourth Amendment claim be DENIED.

It is respectfully **RECOMMENDED** that Sam Kooiker's Motion to Dismiss For Failure To State a Cause of Action (legislative immunity) should be DENIED.

36

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

Dated this **23**day of April, 2014.

BY THE COURT:

John Simko
United States Magistrate Judge

37